UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| ALIREZA BAKHTIARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   4:04CV01071 AGF |
| | ) | |
| PAULA M. LUTZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on three separate motions for summary judgment filed by Defendants in this action: Paula Lutz, the Dean of the College of Arts and Sciences at the University of Missouri-Rolla; the Board of Curators of the University; and the Curators of the University, a corporation.  Plaintiff Alireza Bakhtiari, an Iranian national, claims that Defendants' decision to dismiss him as a graduate instructor on January 21, 2005, was in violation of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, in violation of 42 U.S.C. §§ 1981 and 1983, in breach of contract, and entitled Plaintiff to damages based upon promissory estoppel.  For the reasons set forth below, the motions for summary judgment shall be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The record establishes that by email dated October 2, 2001, the University offered Plaintiff, who was living in Iran, "a graduate appointment for the 2002 Winter Semester and 2002 Fall Semester" as a Ph.D. candidate and teacher's assistant.  The appointment included a stipend and tuition waivers for a total of approximately $17,000

per year.  The email noted that a Personnel Action Form ("PAF") would be sent to Plaintiff for him to sign and return.  Doc. #72.3.  Plaintiff's Immigration form I-20, signed by the University's International Student Advisor, noted that Plaintiff was expected to complete his studies by December 31, 2006, the normal length of study for a Ph.D. being five years.  The form showed both estimated costs and estimated income for an academic year as approximately $17,000.  Doc. #72.7.  By letter dated November 12, 2001, the chairman of the University's Chemistry Department wrote to the United States Embassy in Turkey that Plaintiff would participate in training to prepare him for the teaching part of the Ph.D. program. Doc. #72.4.

Plaintiff arrived on campus in January 2002 and began his studies and teaching duties.  The record contains an "Appointment Notification" signed by Plaintiff and a representative of the University in mid-January 2002, showing an employment begin date of January 11, 2002, and a monthly salary, with no end date specified.  In August 2002, Plaintiff filed a grade appeal and complaint with Dean Lutz, charging that one of his instructors during the previous semester, who had given him a low grade, had engaged in capricious grading and condoned cheating on examinations.

In October 2003, Plaintiff complained to the International Affairs office of the University regarding compliance with regulations of the United States Department of Homeland Security ("DHS").  There is no evidence in the record that this complaint asserted any discriminatory conduct.  In an email dated October 23, 2003, a person working in the International Affairs office reported to her supervisor that she had met with Plaintiff that morning and discussed with him DHS's "Special Registration"

requirements for foreign nationals. The email stated that Plaintiff requested a letter telling DHS that Plaintiff was not notified by the University regarding these requirements. Pl.'s Ex. AC.

In November 2003, a female undergraduate student named Suzanne Judd asked the University's Information Technology ("IT") Department to uncover the identity of an individual with whom she had exchanged emails one year prior and who would not reveal his identity to her. IT reported the matter to the campus police. A police report dated December 2, 2003, states that Judd was uncomfortable about the emails, that she suspected Plaintiff as the sender, and that when Plaintiff was interviewed by the police that day, he admitted to this. The investigating officer noted that from reading the emails he could tell that there was a two-way conversation between Plaintiff and Judd. Plaintiff told the officer that he would identify himself to Judd to dispel her uncomfortable feelings, and the officer deemed the case closed with no further action needed. Pl. Ex. AJ.

On December 16, 2003, Plaintiff interacted with University staff in the Student Affairs office regarding the investigation of the Judd matter. On December 17, 2003, Plaintiff filed a Student Discrimination Grievance with the University's EEO Affirmative Action office, complaining that he had been treated in a derogatory way by University staff at the Student Affairs office.

The first day of classes in the Winter 2004 semester was on January 12, 2004. According to Plaintiff, before classes began, he was assigned the task of redesigning the undergraduate Chemistry curriculum, and he began this task at the start of the new

semester. The earliest indication in the record that Dean Lutz did not want to renew Plaintiff's graduate teaching position is an email dated January 15, 2004, stating that she did not believe the University was committed to provide him with funding beyond December 31, 2003.  Pl.'s Ex. O.  Emails between various University officials in mid-January indicate that Plaintiff was re-enrolled as a student for this semester, and that Dean Lutz was upset upon learning this and upon learning that Plaintiff would continue to be paid by the University's computer system even if a new PAF had not been signed, until he was actively removed from the system.

By email dated January 21, 2004, Dean Lutz stated to the Chairman of the Chemistry Department as follows:

> [Plaintiff] is being taken out of the system even as we speak. [The Vice Provost] and I feel (and the Chancellor agrees) that you should meet with [Plaintiff] and tell him what has been done.  This should be handled at the department level. You should never have offered [Plaintiff] (or led him to believe) that there was a [graduate teaching assistantship] in the offing for him under the present circumstances. Until these matters are resolved, we cannot place [the University] in the position of knowing of what he might be capable and yet putting him in a [graduate teaching assistantship] slot.
>
> I am meeting with [another University official] tomorrow (if possible) to discuss the status of the various grievances and charges, as well as how soon we might see some resolution.

Pl.'s Ex. R.

A few days later, the Chairman of the Department informed Plaintiff of Dean Lutz's decision not to renew his graduate teaching appointment.  Despite Plaintiff's requests for an explanation of Dean Lutz's decision, no reason for his termination/non-renewal was provided to him and his demands for implementation of the "Procedures of

Dismissal for Cause" set forth in the University's Handbook were refused.

According to Plaintiff, also on January 21, 2004, he told University officials that he was going to take his complaints about the University to the United States Department of Education and DHS. Plaintiff also asserts that on January 22, 2004, he went with his attorney to the office of the United States Immigration and Customs Enforcement (ICE -- the investigative arm of DHS) "to present case of [the University's] noncompliance." Pl.'s Memo at 4.

The record indicates that Plaintiff was detained by ICE after an Immigration official spoke with Gene Beyer of the University's International Affairs office. The record includes a copy of a fax dated January 26, 2004, from Beyer to an Immigration agent in response to a request for information about Plaintiff. Beyer wrote that Plaintiff's actions in not reporting for the National Security Entry/Exit Registration System (NSEERS) were suspicious. Beyer also wrote that Plaintiff easily erupted into unstable behavior, which caused concern across the campus. Beyer gave several examples of this, including, but not limited to the assertions that complaints with campus police had been filed against Plaintiff for predatory sexual harassment and stalking of young undergraduate girls, and that at a "campus discipline meeting" in December 2003, in which Plaintiff was being investigated for using campus computers for downloading violent pornography and stalking, Plaintiff's behavior was so violent that campus police believed that "physical actions may be appropriate." Beyer wrote that in light of the above, "our office believes that we should bring this student to your attention."

On February 17, 2004, while Plaintiff was still in detention, the University

administration ordered the IT department to freeze Plaintiff's computer account. Plaintiff was released from detention on February 24, 2004, and he returned to campus. He officially withdrew from the University as of March 8, 2004, after demands were made for full tuition payment from him for the current semester. Upon confirmation of Plaintiff's withdrawal, Dean Lutz emailed other officials at the University, "And we all breathe a collective sigh of relief . . . ."

On August 4, 2004, Plaintiff filed this action pro se under Title VII of the Civil Rights Act of 1964. Plaintiff claimed that Dean Lutz terminated his employment as a graduate teaching assistant in retaliation for Plaintiff's initiating an internal formal complaint in August 2002 "about an utterly capricious behavior violating civil rights" and pursuing the complaint until the date of his termination. Plaintiff further claimed that he was also terminated as a Ph.D. student at the University and was being denied access to his computer account there. Plaintiff alleged that the University administration, wrongly claiming that he owed the University money, refused to issue his official transcripts, which he needed in order to obtain a similar position at another university. Plaintiff sought damages for the alleged resulting postponement of his career by five years.

By Order dated January 20, 2005, the Court granted Plaintiff leave to file an amended complaint, adding a breach of contract claim against the Board of Curators of the University, and on February 22, 2005, he filed an amended complaint.[1] Thereafter,

---

[1] The amended complaint was not filed on a form for Title VII actions as the initial complaint had been, and Plaintiff identified his retaliation claim as brought under Title VI. Doc. #24. Defendants moved to dismiss this claim for failure to state a claim, whereupon Plaintiff moved to correct the "typographical error" of his amended complaint

Plaintiff retained counsel, and on August 30, 2005, Plaintiff filed a second amended complaint, signed by counsel. The second amended complaint names as Defendants: Dean Lutz; the Board of Curators of the University of Missouri (the "Board"); and the Curators of the University, a corporation (the "Curators"). In none of Plaintiff's complaints did he assert in which capacity he was suing Dean Lutz. In the general allegations of the second amended complaint, he identifies her as the Dean of the College of Arts and Sciences, and the complaint involves only actions taken in the scope of her official duties. Accordingly, the Court concludes that this suit is against Dean Lutz in her official capacity. See Hood v. Norris, 2006 WL 1913430, at *1 (8th Cir. July 12, 2006) (to state an individual-capacity claim, complaint must either specifically name defendants in their individual capacities or must involve actions taken by the government agents outside scope of official duties); Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997) (same).

In Count I of the second amended complaint, Plaintiff asserts that his discharge on January 21, 2004, was in violation of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, in that "Defendants ordered Plaintiff's discharge because Plaintiff had continued to pursue his academic and civil rights which are constitutionally protected activities." Count II is brought under 42 U.S.C. § 1981 and claims that Defendants discharged him because he "had continued to pursue his academic rights which are a constitutionally protected activity." Count III asserts a claim under 42 U.S.C.

referring to Title VI rather than Title VII. This motion was granted.

§ 1983 for violation of Plaintiff's procedural due process rights in that Defendants refused to provide him with a hearing provided for by University rules and regulations, upon his dismissal.

Counts IV and V are for breach of contract, with Count IV positing breach of an employment contract with Plaintiff covering January 2002 through December 2006; and Count V positing breach of an employment contract covering January 2004 through May/June 2004. In Count VI, Plaintiff claims that he is entitled to damages under a theory of promissory estoppel, in that he relied to his detriment on a promise of employment for five years. Count VII seeks damages for damages for spoliation of evidence. Plaintiff seeks actual damages in each count, and punitive damages as well in Counts I, II, III, and VII.

On December 30, 2005, Plaintiff filed an action in state court against Beyer and the University for libel, slander, and the intentional infliction of emotional distress, based upon Beyer's letter of January 26, 2004, and a phone call to the Special Agent, in which Beyer orally relayed the allegedly intentional lies contained in the letter.

## ARGUMENTS OF THE PARTIES

### Defendants' Arguments

The three Defendants have each filed a separate motion for summary judgment. The motions are, in large part, identical, with one notable exception being that the Board argues that it is not a legal entity amenable to suit, as is the corporate entity known as the

Curators.  In his combined response to the three motions, Plaintiff concedes that the University is properly sued through the Curators (as a corporation).  Accordingly, the Board shall be dismissed as a party, and henceforth, the term "Defendants" shall refer to Dean Lutz, in her official capacity, and the Curators.

As to Count I, Defendants concede for purposes of the present motions, that Plaintiff sustained an adverse employment action, which they characterize not as a termination of employment, but as a decision by Dean Lutz not to renew Plaintiff's appointment as a graduate teaching assistant.  Defendants argue, however, that Plaintiff cannot produce evidence that he engaged in protected activity cognizable under the retaliation provision of Title VII, prior to the non-renewal.  Defendants argue that the three internal grievances noted above, which Plaintiff asserted in his deposition as his protected activity, related to Plaintiff's status as a student and not to his status as an employee of the University.  Defendants also argue that Plaintiff has not shown a causal connection between any protected activity and the non-renewal.  Defendants further assert that as arms of the state government, they cannot be liable under Title VII for punitive damages.

With regard to Plaintiff's remaining claims, Defendants invoke Eleventh Amendment immunity.  They also present arguments specific to the merits of each on the remaining claims.  They characterize Plaintiff's claim under § 1981 as encompassing the same elements as his Title VII retaliation claim, and argue that it fails for the same reasons that the Title VII claim fails.

Defendants argue that they are entitled to summary judgment on Plaintiff's

§ 1983 procedural due process claim (Count III) because Plaintiff did not have a

protected property right in being reappointed as a graduate teaching assistant each

semester. Defendants point to Section 310.020 A.2.c of the University's Collected Rules

and Regulations (the University's "Handbook"), which states that a graduate teaching

assistant is a "nonregular" appointment, and to Section 310.020 B.1.c, which provides as

follows:

> Nonregular Term Appointments - Nonregular term appointments begin
> at a specified date and terminate at a specified date. Such appointments
> are usually for a period of one academic year but may be for a longer or
> shorter period, except that no single term appointment shall be for a
> period of longer than three years. No number of nonregular term
> appointments shall create any presumption of a right to reappointment
> on term or continuous basis, subject to the limitations described in
> Section 310.020 A.2.

Doc. #72.13. Defendants have submitted the affidavit of the University's Director of

Human Resources (Doc. #72.12), who attests that a graduate teaching assistant whose

appointment is not renewed for another term does not have a right to invoke "dismissal

for cause" proceedings under Section 310.020 C.2, which provides that term appointees,

regular or nonregular, may be terminated only for cause if termination occurs prior to

expiration of the stated term.

Defendants have also submitted the affidavit of Dean Lutz dated January 11,

2006. Dean Lutz attests that graduate teaching assistants are appointed by her to term

appointments with a beginning and ending date by means of a PAF, and that Plaintiff's

final term appointment was from August 18, 2003, to December 31, 2003. The PAF

submitted as an exhibit to Dean Lutz's affidavit is entitled, "Personnel Action Form For

Data Entry Purposes Only." It shows an effective date of August 18, 2003, and an end date of December 31, 2003, for Plaintiff as a graduate teaching assistant. Doc. #72.9.

Dean Lutz attests that her decision not to renew Plaintiff's appointment after December 31, 2003, was based upon the following factors: she learned that Plaintiff had admitted to University police that he had sent emails, using an alias, to a female undergraduate student, who was made uncomfortable by them and reported the matter to the police; she received reports from Chemistry department faculty and staff that Plaintiff treated female graduate teaching assistants in a rude manner in front of their undergraduate students; "there had been reports" that Plaintiff had not been honest in statements to Chemistry faculty and International Affairs staff; there were reports that Plaintiff had displayed inappropriate anger as a graduate teaching assistant and with the International Affairs office; and she had heard reports that Plaintiff was being investigated by the FBI in connection with an email sent overseas to a female, with this playing a small part in her decision not to renew Plaintiff's appointment. Dean Lutz stated that her "foremost concern" was that she did not want Plaintiff in a position of authority over undergraduate students. Doc. #72.8.

Defendants raise another argument for summary judgment on Plaintiff's § 1983 claim, namely, that the University is not a "person" within the meaning of § 1983.

Defendants next argue that Plaintiff's breach of contract claims fail because there was never a written agreement to employ Plaintiff beyond December 31, 2003. They argue that the longest appointment ever offered to Plaintiff was a two-semester appointment as a graduate teaching assistant for the Winter and Fall 2002 semesters,

when he was accepted to the University. Defendants argue that Missouri's statute of frauds, Mo. Rev. Stat. 432.010, would bar the enforcement of any employment agreement not to be performed within one year, unless the agreement was in writing. They argue that the documents relied upon by Plaintiff -- the recruitment email, the I-20 immigration form, and the letter to the Embassy in Turkey -- do not constitute a written contract for employment beyond the Fall 2002 semester, and that Plaintiff had no contractual rights to employment following the expiration of his term appointment on December 31, 2003.

On Plaintiff's promissory estoppel claim, Defendants maintain that Plaintiff is unable to show that when the University recruited him, it made a promise of employment for five years. Defendants further argue that Plaintiff cannot show detrimental reliance on any such promise, nor resulting injustice. In addition, Defendants rely on Missouri cases which refused to apply promissory estoppel in the employment context where it would frustrate the statute of frauds.

## Plaintiff's Arguments

In a combined response to Defendants' motions for summary judgment, Plaintiff argues that in filing the internal complaints and informing the University that he was going to present his grievances to the Departments of Education and Homeland Security, he was exercising his constitutional rights and thus these activities were protected activities under Title VII's anti-retaliation provision. Plaintiff also argues that the reasons proffered by Dean Lutz for his termination fail to rebut his prima facie case of retaliation because Defendants have not offered any facts that support the legitimacy of these

reasons.  He  reviews each reason asserted by Dean Lutz in her affidavit, and explains

why he believes the reason is pretextual.  For example, Plaintiff argues that Dean Lutz's

first reason, based upon the emails Plaintiff sent to Judd, is clearly pretextual in light of

the campus police report in closing the case.

Plaintiff argues that he can recover punitive damages against the University

under the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. 213.010, and that

although his complaint does not mention the MHRA, the elements of a retaliation claim

are the same under the MHRA and Title VII, and so the Court should construe the

complaint to state a MHRA claim.  In a footnote, Plaintiff asks the Court alternatively, to

permit him to amend his complaint to add reference to the MHRA.

Plaintiff recognizes Defendants' Eleventh Amendment immunity as to Plaintiff's

claims for damages, but argues that Defendants waived this immunity by purchasing

insurance for employment practices liability, and by statutorily granting the Curators the

power to sue and be sued.

With respect to his claim under § 1983, Plaintiff argues that he was entitled to

procedures set forth in the University's Handbook as an employee who was terminated

before the end of an appointment period, as he began working in the Winter 2004

semester before Dean Lutz terminated him.  He also maintains that he had a five-year

contract for employment as a teaching assistant, and was terminated before the end of this

period.  He further argues that he was denied his rights under the Handbook's provision

for discrimination grievances filed by students, and that his property rights were violated

by Defendants denying him access to his computer account and refusing to release his

13

transcript.

Plaintiff asserts that he has an actionable breach of contract claim based upon a five-year contract from January 2002 through December 2006, or at least for the 2004 Winter semester. Lastly, Plaintiff argues that even if there is no enforceable contract, promissory estoppel provides relief, as Plaintiff came to the United States in reliance upon Defendants' promise of employment while he pursued his Ph.D. He asserts that Defendants broke this promise by terminating him, placing him in deportation proceedings, expelling him from the University without cause, and retaining his transcripts and computer records.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. Tademe v. St. Cloud State Univ., 328 F.3d 982, 986 (8th Cir. 2003). The moving party bears the burden of showing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

When a motion for summary judgment is made and properly supported by evidence, the non-moving party may not rest on the allegations of his pleadings but must

set forth specific facts, by affidavit or other evidence, showing that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

## DISCUSSION

### Title VII Retaliation Claim

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer "to discriminate against any of his employees . . . because he [the employee] has opposed any practice made an unlawful employment practice [by Title VII] . . . or because he has made a charge [under Title VII]." 42 U.S.C. § 2000e-3(a).

Because there is no direct evidence of retaliation to support Plaintiff's claims, the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973), applies. <u>See</u> <u>Twymon v. Wells Fargo & Co.</u>, ___F.3d___, 2006 WL 2595961, at *9 (8th Cir. Sept. 12, 2006). Under this analysis, the employee must first establish a establish a prima facie case of retaliation by showing that (1) he engaged in

statutorily protected activity; (2) the employer took an adverse action against him; and (3) a connection exists between the two occurrences.  Id.; Green v. Franklin Nat'l Bank of Minneapolis, ___F.3d___, 2006 WL 2419171, at *8 (8th Cir. Aug. 23, 2006).

If the plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the employer, who must rebut the presumption of retaliation with evidence of a legitimate, nonretaliatory reason for the challenged action.  If the employer meets that burden, the employee may prevail by proving by a preponderance of the evidence that the employer's reason was a pretext for intentional retaliation.  Twymon, 2006 WL 2595961, at *7; Green, 2006 WL 2419171, at *8.  "To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was [retaliation]."  Twymon, 2006 WL 2595961, at *8.

"Protected activity" in this context includes opposition to employment practices prohibited under Title VII; however, a plaintiff need not establish that the conduct he opposed was in fact prohibited under Title VII; rather he need only demonstrate that he had "a good faith, reasonable belief that the underlying conduct violated [Title VII]."  Green, 2006 WL 2419171, at *8; see also Buettner v. Arch Coal Sales Co., 216 F.3d 707, 715 (8th Cir. 2000).  The "adverse action" requirement covers not only an employer's actions that affect employment or alter the conditions of the workplace, but other adverse actions as well.  Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2412 (2006).  Nevertheless, this requirement is only satisfied by adverse actions that are "harmful to the point that they could well dissuade a reasonable worker from making or

supporting a charge of discrimination."  Id. at 2409.

Here, as an initial matter, the Court notes that Plaintiff never quite states the alleged improper basis for Defendants' allegedly discriminatory conduct which he opposed.  The Court will assume that this basis is that Plaintiff is Iranian, which encompasses not just national origin, but also race and ethnicity.  See Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 756-57 (7th Cir. 2006).  The Court agrees with Defendants that pursuing the grade appeal/teaching grievance did not constitute protected activity under Title VII.  Unfairness in grading and poor teaching are not practices which a reasonable person could believe are prohibited by Title VII where the grade in question had no effect on the student's employment status.  Thus, complaining about, or "opposing" these matters does not constitute protected activity under Title VII's anti-retaliation provision.

The Court arrives at the same conclusion with respect to Plaintiff's complaints to the International Affairs office about the University's alleged noncompliance with immigration regulations, although a somewhat closer question is presented here. Nowhere does Plaintiff explain what the complained-of noncompliance was, or how this alleged noncompliance affected Plaintiff as an employee of the University, such that he could have reasonably believed that the noncompliance was prohibited under Title VII. Nor does he provide any evidence that he was complaining of an unlawful employment practice based upon his race or national origin.  See Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1028-29 (8th Cir. 2002) (plaintiff was not engaged in protected activity, and thus failed to establish a prima facie case of retaliation, where she complained that she

was entitled to a pay increase and a change in job title, but did not attribute the failure to give her a raise or a promotion to sex discrimination); Cherry v. Ritenour Sch. Dist., 253 F. Supp. 2d 1085, 1099 (E.D. Mo. 2003) ("complaining of working conditions without attributing the complaints to an illegitimate criterion does not constitute opposition to an unlawful employment action and is not protected activity").

Similarly, the specific conduct complained about by Plaintiff in the December 2003 EEO complaint is not entirely clear. Plaintiff has not provided a copy of the complaint and nowhere asserts that he complained of unlawful work-related discrimination based upon his race or national origin. The only description Plaintiff offers is that he was treated in a derogatory way by University staff at the Student Affairs office on one occasion. The Court concludes that no reasonable person would have believed that derogatory remarks and/or conduct on one occasion by a University official in the Student Affairs office violated Title VII. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam) (holding that no reasonable person could have believed that a single incident of sexual harassment violated Title VII, precluding retaliation claim based upon internal complaints about the incident); Greene v. A. Duie Pyle, Inc., 2006 WL 694377, at *8 (4th Cir. Mar. 20, 2006) (per curiam) (terminated male employee did not have an objectively reasonable belief that his former employer's actions in allowing sexually offensive materials in the workplace were unlawful, and, thus, he did not engage in protected activity by reporting the inappropriate material); see also Arraleh v. County of Ramsey, 2006 WL 2561240, at *8 (8th Cir. Sept. 7, 2006) (conduct which engenders offensive feelings in an employee but does not affect the conditions of

employment, does not violate Title VII).

Indeed, Plaintiff several times asserts that he was retaliated against for exercising his academic and constitutional rights. This, however, is not prohibited under Title VII. In sum, even viewing the evidence in the light most favorable to Plaintiff, the Court concludes that he was not engaged in "protected activity" under Title VII, and that accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim.

In addition, the Court concludes that Plaintiff did not show by a preponderance of the evidence that Defendants' proffered reasons for the termination/non-renewal of his employment were pretexts for retaliation. The proper inquiry at the summary judgment stage is whether the decision-maker believed that the plaintiff was guilty of the conduct asserted as the basis for the adverse action. Scroggins v. Univ. of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000); Twymon, 2006 WL 2595961, at *7 (a proffered legitimate, nonretaliatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination; the question in evaluating pretext is whether the employer honestly believed the employee violated the company's code of conduct, not whether the employer was factually correct in its conclusion).

Evidence of "similarly-situated employees of a different national origin receiving more favorable treatment can demonstrate pretext." Ramirez v. Gencorp, Inc., No. 05-3825, slip op. at 4 (8th Cir. Sept. 14, 2006). Here Plaintiff presents evidence that in 2001, chemistry graduate students at the University negligently caused an explosion and

that the then chairman of the department was convicted of and fined for resisting arrest in connection with an investigation into the explosion, yet the University took no disciplinary action against the students or chairman. Clearly, the chairman of a department and a graduate teaching assistant are not similarly situated in this context, and the students' negligence is not analogous to the reasons Dean Lutz proffered for Plaintiff's non-renewal. Plaintiff also asserts that his teaching evaluations were higher than those of other graduate student assistants who were retained by the University. This, however, is not relevant as Plaintiff was not let go due to poor performance.

Even if Plaintiff's evidence calls into question the ultimate validity of some of the reasons asserted by Dean Lutz for her decision not to renew Plaintiff's appointment, the fact remains that he has not shown that Dean Lutz did not have legitimate nonretaliatory reasons for her decision, or that she was motivated by retaliatory animus. Reaching this conclusion does not involve credibility determinations by the Court, which would be impermissible at this summary judgment stage of the case. For example, even if Plaintiff did not inappropriately lose his temper at the Student Affairs office, there is no evidence to suggest that Dean Lutz did not believe he had. See Mershon v. St. Louis Univ., 442 F.3d 1069, 1075 (8th Cir. 2006) (holding that even if plaintiff did not threaten a faculty member, the University's decision to ban plaintiff from campus for the stated reason that he made the threat, was not a pretext for discrimination, where plaintiff did not dispute that the decision-maker perceived plaintiff's comments to be a threat and had communicated this perception to others), cited with approval in Twymon, 2006 WL 2595961, at *8.

In addition, it is undisputed that an undergraduate student did complain about emails sent to her by Plaintiff without disclosing his true identity, and that the matter was serious enough to cause a police investigation. That Plaintiff elected, as a result of the investigation, to take steps to resolve the matter to the satisfaction of the police in no way suggests that this was not considered a serious matter by Dean Lutz. Nor does the closing of the police case somehow preclude the University from considering this a serious matter and exercising its own options. Accordingly, on this alternative ground of Plaintiff's failure to show pretext, Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim.

**§ 1983 Due Process Claim**

The Court concludes that Plaintiff's claims under § 1983 cannot proceed for two reasons. First, Eleventh Amendment immunity shields the Defendants in this case from a claim for damages in federal court. As noted above, in each complaint, Dean Lutz was sued in her official capacity. A suit against a state official in her official capacity is the same as a suit against the state. Hafer v. Melo, 502 U.S. 21, 25 (1991). And The Curators of the University, as a corporation, was sued, without naming the individual curators in their individual capacities. Thus Eleventh Amendment immunity applies here. See Sherman v. Curators of the Univ. of Mo., 871 F. Supp. 344, 348 (W.D. Mo. 1994) (holding that the University of Missouri is a state instrumentality entitled to Eleventh Amendment immunity), cited with approval in Scherer v. Curators of the Univ. of Mo., 49 Fed. Appx. 658, 659-59 (8th Cir. Oct. 31, 2002) (per curiam); see also Ormerod v. Curators of the Univ. of Mo., 97 Fed. Appx. 71, 72 (8th Cir. May 21, 2004) (per curiam).

The purchase of insurance or the granting of authority to the Curators to sue or be sued does not constitute a waiver of immunity from suit <u>in federal court</u>. <u>See</u> <u>Jackson v. Ga. Dep't of Transp.</u>, 16 F.3d 1573, 1584 (11th Cir. 1994) (state agency waived its sovereign immunity to suit in state court to the extent there was insurance coverage, but this did not waive the agency's Eleventh Amendment immunity to suit in federal court); <u>Westinghouse Elec. Corp. v. W. Va. Dep't of Highways</u>, 845 F.2d 468, 471 (4th Cir. 1988) (same); <u>Long v. Curators of the Univ. of Mo.</u>, No. 92-0814-CV-W-6, 1993 WL 52821, at *2-3 (W.D. Mo. Feb. 23, 1993) (same).

Second, a state official in her official capacity and a state entity are not "persons" within the meaning of § 1983. <u>See</u> <u>Zar v. S.D. Bd. of Examiners of Psychologists</u>, 976 F.2d 459, 464 (8th Cir. 1992) (citing <u>Hafer</u>, 502 U.S. at 27); <u>Mackey v. Camp</u>, 415 F. Supp. 323, 324 (W.D. Mo. 1976). The Court notes that even after Defendants raised these issues, Plaintiff did not seek to amend his complaint to name (and then serve) Dean Lutz or the individual curators in their individual capacities. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1983 claim.

## § 1981, Breach of Contract, Promissory Estoppel, Spoliation of Evidence

The Eleventh Amendment immunity noted above also applies to Plaintiff's § 1981 claim and state law claims for damages. <u>See</u> <u>Sherman</u>, 871 F. Supp. at 348 (promissory estoppel and breach of contract); <u>Singletary v. Mo. Dep't of Corr.</u>, 423 F.3d 886, 890 (8th Cir. 2005) (§ 1981; citing cases). Any cause of action for damages for spoliation of evidence that Plaintiff might have against Defendants, <u>see</u> <u>Baugher v. Gates Rubber Co.</u>, 863 S.W.2d 905 (Mo. Ct. App. 1993) (discussing circumstances in which

such an action might lie in Missouri), would also be barred in federal court by Eleventh Amendment immunity.[2]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to strike portions of Plaintiff's Verified Response to Defendants' Statement of Undisputed Material Facts and Supplemental Material Facts is **DENIED**. [Doc. #89]

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendant Paula Lutz is **GRANTED**. [Doc. #71]

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendant The Board of Curators of the University of Missouri is **GRANTED**. [Doc. #69]

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendant The Curators of the University of Missouri is **GRANTED**. [Doc. #67]

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a memorandum in support of his punitive damages claim is **DENIED as moot.** [Doc. #91]

---

[2] The Court notes that by separate Memorandum and Order, the Court denied Plaintiff's motion for sanctions based upon his claim of spoliation of electronic evidence by Defendants.

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of September, 2006.